25 C.C.P.A.(Patents)

### WHITEHOUSE v. SAURER.

Patent Appeal No. 3892.

Court of Customs and Patent Appeals.
Feb. 28, 1938.

H. C. Lord, of Erie, Pa. (Charles E. Riordon, of Washington, D. C., of counsel), for appellant.

Ely & Frye, of Akron, Ohio (Albert L. Ely and Bernard C. Frye, both of Akron, Ohio, of counsel), for appellee.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges.

GARRETT, Presiding Judge.

This is an appeal from a decision of the Board of Appeals of the United States Patent Office affirming the decision of the Examiner of Interferences awarding priority of invention to the party Saurer upon two counts (the only counts involved) of an interference.

The interference was declared between a reissue patent, No. 19,017, issued to Whitehouse for an improvement in a cushion support, dated December 5, 1933, granted upon an application filed September 9, 1933, for the reissue of an original patent, No. 1,914,-348, dated June 13, 1933, upon an application filed February 13, 1932, on the one hand, and, on the other, an application of Saurer filed October 11, 1933, for improvements in resilient mountings, the specification reciting an improvement of the resilient mountings shown in Saurer's copending application filed July 19, 1931.

The counts originated with the senior party Whitehouse, count 1 being claim 17 of his original patent (claim 13 of his reissue), while count 2 first appeared in the reissue as claim No. 23. The counts read:

"Count 1. In a support, a rigid supporting side wall, a flexible rubber part bonded to the wall and projecting therefrom in load carrying relation thereto, and disposed a substantial distance from an end of the supporting wall forming a recess providing for movement of the rubber part toward the offset free edge of the side wall, and means receiving a load carried by the rubber part, said support being so constructed and arranged that the normal load thrust on the rubber part is carried by the rubber in shear,

the rubber at the recessed end extending over the edge of the supporting wall forming a cushion support for the supporting wall.

"Count 2. In a support, a rigid supporting side wall, a flexible rubber part bonded to the wall and projecting therefrom in load carrying relation thereto, and disposed a substantial distance from an end of the supporting wall forming a recess providing for movement of the rubber part toward the offset free edge of the side wall, and means receiving a load carried by the rubber part, said support being so constructed and arranged that at least the major portion of the normal load thrust on the rubber part is carried by the rubber in shear, the rubber at the recessed end extending over the edge of the supporting wall forming a cushion support for the supporting wall."

Saurer, in his preliminary statement, alleged conception, first drawings, written description, and reduction to practice all in the early part of June, 1931. Whitehouse claimed September-October, 1927, for conception, drawings, disclosure to others, and reduction to practice, with first written description in December, 1929. His statement also alleged that "on or about the 3rd day of October 1927 he began actively exercising reasonable diligence in adapting and perfecting the invention."

With respect to Saurer's claimed dates, the Examiner of Interferences made the following finding: "Saurer's exhibit 6, together with his testimony and that of Workman and Nelson, establishes conception by the junior party in June, 1931, and the testimony of Saurer, Farkas and Sheldrick establishes successful tests amounting to a reduction to practice at least as early as July 10, 1931. Since these dates do not seem to be seriously questioned in Whitehouse's brief, it is not necessary to discuss this evidence in detail. It may be noted that Whitehouse admits (XQs. 203 and 204) that the Saurer device had been released for production on the Pierce-Arrow car in January, 1932, and that he saw it at that time, so that there can be no question that Saurer had reduced to practice by this date, even if his proofs be disregarded."

It will be observed that the date so awarded Saurer for reduction to practice was prior to the filing date (February 13, 1932) of the original application of Whitehouse.

Whitehouse, in his appeal to the Board of Appeals, assigned no error as to the foregoing finding, and that tribunal, after stating its substance, said: "Whitehouse does not deny this finding by the Examiner of Interferences."

In the appeal to this court, the nineteenth assignment of error reads: "(19) The Board of Appeals erred in holding, if it did so hold, reduction to practice on the part of Saurer *in July, 1931.*" (Italics ours.)

In view of the fact that Whitehouse did not challenge the finding in his appeal to the board, that tribunal had no occasion specifically to pass upon it, and it may be doubted whether the assignment of error in the appeal to this court is in a form which requires consideration here. However this may be, it is noted that the assignment is limited to the July, 1931, period and does not call in question the January, 1932, period which was also prior to the Whitehouse filing date. We find no reason to question the correctness of the award to Saurer of the July date.

Both tribunals of the Patent Office concurred fully, for reasons specifically given, in holding: (a) That the device relied upon by Whitehouse for actual reduction to practice in 1927 did not meet the counts; (b) that, even if the device is within the counts, it was not reduced to practice, or was an abandoned experiment; and (c) that there was lack of diligence on the part of Whitehouse over the requisite period— that is, from June, 1931, to February, 1932.

It may be said that the question of the Whitehouse device not supporting the counts was not raised by the party Saurer but by the Examiner of Interferences. The Primary Examiner allowed the claims which now constitute the counts, and Whitehouse, arguing the matter of interpretation to which he devotes much attention, urges that the examiner must have given them an interpretation sufficiently broad to read on the said device, and that they should have been so interpreted by the other tribunals of the Patent Office and should be so interpreted here. We do not understand, however, that there is any challenge of the legality of the action of the Examiner of Interferences in raising the question sua sponte. Indeed, the brief for Whitehouse says: "The Examiner's [of Interferences'] decision is based on reasons originally advanced by him. While occasionally a party may en-

tirely overlook sound reasons for supporting his position or may, as in this case, accept a contrary view, it is obvious, the advancing of controlling reasons by the trial tribunal not recognized or urged by either party is fraught with more probable error than where these matters are threshed out in testimony and argument, this, it seems, should be considered in considering the persuasiveness of the decisions of the Patent Office on this subject."

The reduction to practice claimed by Whitehouse in 1927 is the production of a device, illustrated by an exhibit, introduced by Exhibit I, the molds for which were made from a sketch appearing upon a "Shop Memorandum" introduced as Exhibit N.

Exhibit I consists of a metal ring about one inch in diameter and five-eights of an inch in height, into which has been inserted a rubber part completely filling the ring and extending exactly to the bottom thereof. A bolt-like metal member extends through the center of the rubber part, its lower end showing slightly below the bottom of the rubber part and its upper end, which is threaded, rising to the height of about an inch above the main upper part of the rubber. Attached to the bottom of the metal ring is a hollow rubber flange, or ring, which coincides with the dimensions of the metal ring, which apparently is molded with the rubber filling in the metal ring.

The only use, or attempted use, of the device illustrated by Exhibit I, shown by the record, was for cushioning typewriting machines, and in his decision the examiner assumed from the record that such devices "were made in 1927 and placed on typewriters."

The involved Saurer device and other devices of Whitehouse (later produced and not involved here) seem to have been designed primarily for use as mountings in automobiles.

It is noted that each of the counts requires a rigid supporting side wall having a flexible rubber part bonded thereto, the rubber so bonded to be. "disposed a substantial distance from an end of the supporting wall forming a recess providing for movement of the rubber part toward the offset free edge of the side wall * * *."

The Examiner of Interferences points out that in Exhibit I there is no recess whatever between the inner side of the metal ring (the side wall) and the rubber member which fills it, "much less the substantial one required by the counts." He adds: "The only recess provided by exhibit 1 lies solely within the rubber flange at the base of the metal ring. Similarly, the sketch on the shop order, exhibit N, shows the rubber extending to or below the bottom of the metal ring. Whether or not this arrangement is equivalent to that specifically required by the counts need not be considered since it is well settled that, in interference issues, every limitation must be regarded as material (Bijur v. Rushmore, 1918 C.D. 122 and authorities there cited). It follows that regardless of what was done with devices such as exhibit I, no reduction to practice of the invention here in issue could have been effected."

The board specifically approved the foregoing, saying inter alia: "In view of the cessation of activity by Whitehouse with respect to Exhibit I over a long period and his resumption of activity after he saw the Saurer device in production at the Pierce-Arrow factory, we agree with the Examiner of Interferences that there was no clear reduction to practice of Exhibit I."

Before us appellant contended for an interpretation of the counts which he insisted would lead to a holding that Exhibit I supports them. It seems to us it would be erroneous to hold that the exhibit can possibly meet the counts, unless the limitation under discussion be interpreted entirely out of them, and this we are not at liberty to do. We agree with the tribunals of the Patent Office that the limitation is a material one, and cannot accept the construction of Whitehouse to the effect, as stated by the board, that "the counts are completely satisfied by the extension of the rubber with no other relation or function than a mere cushion under the metallic shell to prevent the metallic contact of that shell with a supporting surface." This contention is inconsistent, as the board points out, with the statement in the oath accompanying the application for reissue that "the claims [of the original patent] do not definitely state that at least the major portion of the load thrust is sustained by the rubber in shear."

We do not overlook the general rule stated by Whitehouse to the effect that where two interpretations are possible that one will be accepted which sustains the validity of an issued patent, but the rule is not applicable here because, in our opinion, the interpretation for which Whitehouse contends cannot reasonably be applied.

Under this view we do not regard it necessary to discuss the matter of abandoned experiment. Assuming, without deciding, that what Whitehouse did constituted a reduction to practice of whatever invention, if any, was involved in Exhibit I (and that he never abandoned it), such was not a reduction to practice of the invention of the counts. He may not rely upon the sketch, Exhibit N, nor the device, Exhibit I, for either conception or reduction to practice, in 1927, of the matter at issue in the counts.

The only remaining question requiring consideration here is that of diligence on the part of Whitehouse, following what seems to have been a conception of the invention in January, 1931.

The brief for Whitehouse says: "The Examiner of Interferences * * * and the Board * * *, inferentially at least, conceded an earlier conception date to Whitehouse, but found that there was lack of diligence on the part of Whitehouse after the entrance of Saurer into the field."

There is no specific award of any date of conception to Whitehouse by either of the tribunals of the Patent Office. The Examiner of Interferences says: " * * * It is suggested that sketches showing the invention were made during 1931 but nothing definite was done toward making and testing anything corresponding to the counts, nor were steps taken toward filing an application which, so far as appears, might have been done at any time. The fact that Whitehouse, after delaying for more than four years, filed his application within a month after seeing Saurer's development can scarcely be regarded as a coincidence. If he could file the case so promptly at this time, there is no apparent reason why he could not have done so long before. It must be held that Whitehouse did not exercise reasonable diligence between June, 1931, and February, 1932, when his application was filed."

There is in the record a drawing, accompanying a letter, the two consolidated and filed as Exhibit R, which seems to depict the invention. The letter bears date of January 19, 1931.

Assuming that it does show the invention at issue, it entitles Whitehouse to an award of a date of conception earlier than any date awarded Saurer for conception and reduction to practice, and the question then arises as to the diligence of Whitehouse.

The record has been examined with care in an effort to determine just what Whitehouse did in the way of constructing a device conforming to Exhibit R, or the doing of anything which might constitute diligence.

We find certain other sketches contained in Exhibit S, dated November 30, 1931, which seem to show the invention, but this date is after the date of July, 1931, awarded to Saurer for reduction to practice, and aside from that we fail to find any definite evidence of any device being constructed in accordance with the sketches prior to the time in January, 1932, when Saurer's device is clearly shown to have been in existence with Whitehouse having knowledge of same.

We think it must be held that Whitehouse failed to show diligence during the critical period.

In consequence of the foregoing facts, we find no error in the decision of the Board of Appeals, and the same is affirmed.

Affirmed.